IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

NOVEMBER 1995 SESSION



FILED

February 27, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9501-CR-00012 |
| | ) | |
| | ) | Bradley County |
| v. | ) | |
| | ) | Honorable R. Steven Bebb, Judge |
| | ) | |
| ANGELA MANNING, | ) | (Especially aggravated kidnapping, especially |
| | ) | aggravated robbery, aggravated rape (five |
| Appellant. | ) | counts), especially aggravated burglary, |
| | ) | conspiracy to commit aggravated burglary, |
| | ) | theft of property valued over $1000) |

For the Appellant:

Ashley L. Ownby
440 Worth Street, N.W.
P.O. Box 176
Cleveland, TN 37364-0176

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
and
Amy L. Tarkington
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Jerry N. Estes
District Attorney General
and
Joseph Rehyansky
Assistant District Attorney General
203 E. Madison
Athens, TN 37303-0647

OPINION FILED:_____

ESPECIALLY AGGRAVATED KIDNAPPING, ESPECIALLY AGGRAVATED
ROBBERY, AGGRAVATED RAPE, CONSPIRACY TO COMMIT AGGRAVATED
BURGLARY, AND THEFT OF PROPERTY VALUED OVER $1,000 CONVICTIONS
AFFIRMED; ESPECIALLY AGGRAVATED BURGLARY CONVICTION MODIFIED TO
AGGRAVATED BURGLARY

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Angela Manning, appeals as of right her convictions by a jury in the Bradley County Criminal Court for especially aggravated kidnapping, especially aggravated robbery, five counts of aggravated rape, all Class A felonies, especially aggravated burglary, a Class B felony, conspiracy to commit aggravated burglary, a Class D felony, and theft of property valued over one thousand dollars, a Class D felony. As a Range I, standard offender, she received a twenty-five-year sentence for each of the Class A felonies, a twelve-year sentence and twenty-five-thousand-dollar fine for the especially aggravated burglary, a four-year sentence and five-thousand-dollar fine for the conspiracy to commit aggravated burglary, and a four-year sentence for the theft of property valued over one thousand dollars. All sentences are to be served concurrently. The defendant contends that:

> (1) the trial court committed reversible error by excluding impeachment evidence; and
>
> (2) the trial court erred by allowing the victim to identify the defendant at trial.

We disagree with the defendant's contentions. However, we recognize, as plain error, that the defendant's conviction for especially aggravated burglary is prohibited under T.C.A. § 39-14-404(d). We reduce the especially aggravated burglary conviction to aggravated burglary and impose a four-year sentence and ten-thousand-dollar fine for the conviction.

This case involves events on the morning of October 31, 1993, at a house where Faye Watson, her husband and parents resided. Mrs. Watson, a victim of the offenses, testified that on October 30, 1993, she received a telephone call from Shannon Blaylock, her former foster son, who asked whether she would be going to church the next morning. She said that she told him that she was and that he replied that he may see her there. The victim said that she did not attend church on October

2

because she felt sick. She stated that her daughter called her at 10:30 a.m. that morning, after her parents and husband had left for church. Shortly after she got off the telephone with her daughter, she was leaving the bathroom of the house on her way to her bedroom when she heard a noise. She turned and saw a man, whom she later identified as Scott Minton, in the living room. She also recognized Shannon Blaylock's voice coming from another room and noticed that the defendant was also standing in the living room. She said that both Minton and the defendant had a knife but that Minton assured her that he only wanted her money and that he would not hurt her. She said that the defendant followed her and Minton to her bedroom where she gave Minton approximately two hundred dollars out of her pocketbook and some money from her piggy bank. She said that the defendant and Minton insisted that there was more money, but she kept telling them that there was not.

The victim testified that Minton pushed her from the bedroom into the living room and that the defendant pulled on her housecoat causing it to unbutton. The victim testified that the defendant told Minton to burn her and that Minton used a cigar to burn her several times. She said that Minton burned her three or four times on the chest, twice on the breasts, once in the middle of her stomach, three times on her buttocks, once in the center of her back, and once in the center of her right thigh. The victim said that the defendant and Minton passed a gun back and forth to each other during the attack and that the defendant burned her face with a cigarette.

The victim also detailed various sexual assaults on her that were committed by the defendant and Minton. She said that the defendant ordered Minton to perform anal sex on her, ordered Minton to make her perform fellatio on him and then ordered Minton to urinate on her. The victim testified that Minton complied with the defendant's orders while the defendant assaulted her with a gun. The victim explained that while Minton was up at her head the defendant placed the gun into her vagina.

3

The victim said that at one point the defendant dropped her shorts and sat on her face, forcing her to perform cunnilingus. The victim said that the defendant performed cunnilingus on her and that someone penetrated her vagina with a can of room deodorizer. The victim said that the assaults ended when Minton got scared because the gun discharged, shooting the victim in the leg.

During cross-examination, the victim was questioned about inconsistencies between her testimony and prior statements that she had made. She also admitted that in 1992 she wrote three or four thousand dollars worth of bad checks to her employer, K-Mart. Although she admitted returning some of the goods she purchased with the checks for a refund, she said that she could not remember what she did with the money from the goods because she had a bad calcium problem at the time. She explained that she had been suffering from a "calcium storm" and that she did not know what she was doing. She said that as soon as she realized what had happened she called the head of security for K-Mart.

Ellen Summers, Mrs. Watson's daughter, testified that she lives next door to the house where Mrs. Watson resided on the day of the offenses. She said that she talked to the victim on the telephone at 10:30 that morning and that she did not see a car drive up to the house that morning and did not hear a gunshot. Mrs. Watson's father testified that seven thousand, six hundred dollars was taken from his closet that day. He said that only his wife knew where he kept the money.

Roxanne Blackwell, a deputy sheriff with the Bradley County Sheriff's Department testified that she was dispatched to go to the victim's residence a little after eleven on October 31. She said that when she arrived she found the victim lying on the living room floor with burns on her face, chest, and buttocks and a gunshot wound in her leg.

4

Phillip Matthews, a former detective with the Bradley County Sheriff's Department, testified that he met with the victim on October 31 and that she picked the defendant out of a photograph array. He said that he went to Dayton sometime around noon or after and that the defendant and some others were taken to the police station at around 2:00 p.m. or 3:00 p.m. He also testified that he never found any money on any of the suspects during his investigation of the case.

Anthony Benefield, a deputy sheriff with the Bradley County Sheriff's Department, testified that the victim picked the defendant out of a live lineup, and a videotape of the lineup was played for the jury. Deputy Benefield also testified that he interviewed the defendant. A transcript of the interview was introduced into evidence and an audiotape of the interview was played for the jury. According to the transcript, the defendant said that she rode to Cleveland with Shannon, Scott, and another person to get some parts for Scott's car. She said that they went to a house in Cleveland and prowled though drawers in the house. She testified that Shannon got excited and told the others to stop going through drawers. She said that they eventually got back into the car and Shannon showed them some money.

The defendant told Benefield that when they arrived at the house, she asked, "why isn't she at church?" She said that Shannon responded that he did not know whether she was at church. The defendant said that she asked Shannon what they would do if the victim was at church and that Shannon told her that they would wait for her to return. The defendant admitted entering the house. She said that Shannon gave her pantyhose that he had found in a drawer and that she held them until he took them from her and used them to tie the victim's arms. The defendant said that she stood over the victim's face and watched her and Scott. She said that Scott had a cigarette butt and that he "went crazy." The defendant said that she could not watch

5

what Scott was doing but that Scott "went wild."  The defendant said that the victim supposedly had a scar over one of her eyes where she had been burned.

When asked what else Scott did while they were in the living room, the following colloquy occurred between the officers and the defendant:

> AM: Just scare her or something like that.  Like you know who, well wait a minute, you're not a girl.
>
> DG: I know . . . .
>
> AM: Like if you, like some guys they come up and they force you to doing stuff and they'll swing in your face or something like that.
>
> DG: Swing? What?
>
> AM: Their penis.
>
> DG: Ok. . . .
>
> AM: And stuff like that.
>
> DG: Has that ever happened to you?
>
> AM: Yes.  I didn't watch, I just turned my head. . . . hold on to it for a while, and he looked like he got aggravated and he yanked it out of my hand. . . .one of them . . . .
>
> DG: One of them?
>
> AM: No, I wouldn't know what to do with a gun.
>
> DG: Did you see him do anything to her with the gun?
>
> AM: . . . . Threatened her and stuff like that.

The defendant said that she was afraid of guns and that she had the gun at one time but that she gave it to one of the others.  She denied shooting the victim.

On cross-examination, Officer Benefield said that he thought that the defendant was uneducated but was able to function on her own in society.  He also testified that he never recovered any of the money that was taken from the house.

Detective Robert Dale Hyden testified that law enforcement officers did not request that a rape kit be performed in this case because there was no information of genital to genital contact or semen. Detective Hyden said that he took the victim's statement at 12:15 p.m. on October 31, and a copy of the statement was admitted into evidence.

Dr. Elizabeth Daubner testified that she examined the victim on October 31, 1993. She said that the victim had multiple burns on the left side of her face and several other burns on the left side of her buttocks and on her anterior chest wall. Dr. Daubner said that the victim had a total of around ten or twelve burns on her body and that the burns appeared to have been caused by cigarettes. Dr. Daubner said that the victim also had a gunshot wound to her left leg. Dr. Daubner said that the victim had an abrasion on her vaginal vault but did not have any lacerations, tears, or bleeding.

Dr. Rokeya Farooque, a staff psychiatrist with the Forensics Division of the Middle Tennessee Mental Health Institute, testified for the defense. He said that the defendant does not have a mental illness but is of borderline intellectual functioning. Dr. Farooque explained that the defendant's spelling, reading, and math skills are between a third and fifth grade level. Dr. Farooque also stated that the defendant is not a danger to herself or others due to any mental illness.

Susan Smith testified that she lives with Scott Minton's brother, Michael. She said that the defendant came to her house at around 11:00 a.m. or 11:30 a.m. on October 31, 1993. She said that the defendant stayed at the house for about an hour. On cross-examination, Ms. Smith admitted that she told police that the defendant acted "funny" that morning. Ms. Smith explained that the defendant actually acted shy and that the defendant always acts funny or shy. Michael Minton also testified that he saw the defendant as she was leaving his home at around 12:30 p.m. on October 31, 1993.

7

# I. ADMISSIBILITY OF VICTIM'S PRIOR ACTS

In her first issue, the defendant contends that the trial court violated her due process rights by refusing to allow her to present evidence of the victim's prior acts to impeach her testimony. The defendant asserts that the victim's prior acts were admissible under Rules 404(b) or 608(b)(2), Tenn. R. Evid., and that her defense was unfairly limited by their exclusion. The state counters that the trial court properly applied Rules 404 and 608.

During pretrial hearings, the defendant presented testimony as to the evidence she intended to present to impeach Mrs. Watson. The defendant presented proof concerning bad checks Mrs. Watson allegedly wrote in 1989, bad checks Mrs. Watson admitted to writing to K-Mart in 1992, and bad checks that Mrs. Watson allegedly wrote out of her daughter's checking account in 1992. The defendant also presented proof relating to Mrs. Watson's alleged suicide attempts and of her allegedly fraudulent conduct during her marriages to Stony Jack Anderson.

At a pretrial hearing, Roy Lee McJunkin, Jr., a loss control manager with K-Mart, testified about his investigation into checks Mrs. Watson allegedly wrote to K-Mart in 1989. During his investigation he drove to the K-Mart stores in Athens and East Ridge and interviewed store employees. He said that an employee in Athens told him that Mrs. Watson wrote checks for stereo and other equipment and then tried to return the merchandise for a refund three days later. He said that the East Ridge store was having the same type of problem and that two people from that store identified Mrs. Watson as the person who wrote the checks and who also tried to get a refund for merchandise. Mr. McJunkin said that at one point in his investigation, Mrs. Watson told him that she could not have written a check or tried to obtain a refund because she was working at the time. However, when Mr. McJunkin tried to check Mrs. Watson's

8

timecard for that week he found that it was missing and that the hours she worked had to be handwritten on the card.

Bill Matthews of the Athens Police Department testified that he was also involved in investigating Mrs. Watson for writing bad checks in 1989. He said that two out of three witnesses identified Mrs. Watson as the person who passed a bad check to K-Mart by picking her picture out of a photograph lineup. Mr. Matthews said that the grand jury indicted Mrs. Watson but that the charges were dismissed on May 7, 1992.

Attorney James F. Logan, Jr., testified that he represented Mrs. Watson when she was indicted on check charges in Hamilton and McMinn counties. He said that he consulted a forensic services examiner with the Georgia Bureau of Investigation (G.B.I.) for an evaluation of the handwriting on the checks that were passed in Hamilton County. He explained that he consulted the G.B.I. because one of the prosecuting attorneys had experience with that particular agency. Mr. Logan testified that, according to one of Mrs. Watson's time sheets or time cards, it would have been impossible for her to have traveled to Athens and passed one of the checks. Mr. Logan did not recall that any of Mrs. Watson's time cards were missing. He also stated that Mrs. Watson was with one of her family members at the time one of the checks was passed. Mr. Logan testified that Mrs. Watson had a facial deformity during the time the checks were passed but that none of the witnesses who identified her mentioned it.

Mrs. Watson denied writing the bad checks. She testified that checks that had been stolen from her were passed in several different stores in 1989 but that only the K-Mart stores in East Ridge and Athens chose to prosecute her. She stated that pursuant to her lawyer's request, she and her husband went to several of the stores where the checks were passed and asked people who had taken the checks whether they had ever seen her before. She said that several of the clerks said that they had

9

never seen her before. She stated that she was indicted in McMinn and Hamilton Counties but denied writing the checks to K-Mart. She explained that the checks were in her pocketbook when it was stolen. She testified that in 1989 she had proof that she was working in Bradley County at the time one of the bad checks was passed in Athens. However, she could not recall what proof she had, and she said that her time sheet for the week the bad check was passed turned up missing.

Mrs. Watson said that her beautician could verify that she was receiving a permanent when one of the checks was passed. Mrs. Watson explained that she did not tell her attorney about the beautician because she did not want to involve the beautician unless she was going to trial on the check charges. Mrs. Watson also testified that she had abnormalities on her face when the 1989 checks were passed.

Mrs. Watson said that she received reports from the Georgia Bureau of Investigation that said that her signatures were definitely not on the checks that were passed in East Ridge. She said that her lawyer sent her a copy of the letter he sent to McMinn County explaining that the Hamilton County charges had been dropped because her handwriting was not on the checks and stating that he was sure that the McMinn County charges would also be dropped.

Herbert L. Cannon, a loss manager with K-Mart, testified that he conducted an investigation involving Mrs. Watson in 1992. He testified that Mrs. Watson wrote fifty-three checks over a three week period in May and June of 1992 for a total of more than three thousand eight hundred dollars. He said that Mrs. Watson eventually agreed to pay restitution for the checks.

Mr. Cannon testified that his investigation began when he received a phone call from a bank notifying him that K-Mart was having a number of bad checks

10

returned on Mrs. Watson. He said that he talked to Mrs. Watson about some checks and that she said that she would take care of them, explaining that she had been in the hospital and a calcium buildup had affected her thinking. When Mr. Cannon discovered that K-Mart had received fifty-three bad checks totaling more than three thousand eight hundred dollars, he discussed the situation with Mrs. Watson again. Mrs. Watson told him that Emory Hospital had placed a lien against her banking account. Mr. Cannon said that the people at the hospital denied placing a lien against the account for anything and told him that, with the exception of twenty dollars that the hospital had written off, Mrs. Watson's account had been paid in full. Mr. Cannon also testified that Mrs. Watson told him that two other hospitals had placed liens on her account. However, he said that the bank on which the checks were drawn denied that there were any such liens on Mrs. Watson's account. Mr. Cannon said that when he told Mrs. Watson that her story did not check out, she replied by saying that she thought she needed some help and that she believed she had lost some of her ammunition.

Mr. Cannon explained that based on his training and experience, Mrs. Watson's actions were consistent with the perpetration of a fraudulent scheme on K-Mart. He said that Mrs. Watson used ten different driver's license numbers to cash the checks. She told him that she did not have her license with her when she used the checks and that she would just tell the cashiers a license number. Mr. Cannon testified that the checks Mrs. Watson wrote to K-Mart in 1992 were written from two different accounts that had both been closed in 1990. Mr. Cannon said that a lady from the bank told him that one of the accounts the checks were written on was closed in 1990 because some checks from the account had been stolen and others Mrs. Watson had written but had not paid. Mr. Cannon said that the bank wrote off around one hundred eighty-one dollars and closed the account itself.

11

Mr. Cannon testified that he had heard that Mrs. Watson was suffering from some physical disorder when she wrote the checks in 1992. Although he said that he may have noticed that Mrs. Watson's face was swollen a little during that time, he did not notice anything unusual about her behavior. He said that he felt that Mrs. Watson understood what she was doing when she wrote the checks and then sought refunds. Mr. Cannon also testified that he checked into the 1989 bad check accusations against Mrs. Watson and learned that bad check charges had been dropped.

With respect to the 1992 checks, Mrs. Watson testified that she wrote the checks during a time that she was having calcium problems and had a tumor on her parathyroid. She explained that she suffered from calcium storms that prevented her from knowing what she was doing and that she agreed to pay restitution for the checks.

Mrs. Watson's twenty-one-year-old daughter, Jackie Anderson, testified that when she was nineteen she had quit using her checking account and had left about twenty dollars in it. She remembered seeing one of her checkbooks hidden in the back of her mother's pocketbook. Later, she received approximately thirty letters from collection agencies where bad checks had been written on the account to K-Mart and other places. Ms. Anderson testified that she and Mrs. Watson fought over the bad checks but that Mrs. Watson never admitted to writing them.

Dr. Thomas Lee Corey, a clinical psychologist, testified concerning past suicide attempts by Mrs. Watson. He said that he conducted a routine examination on Mrs. Watson, who was then Mrs. Anderson, pursuant to her admission to a hospital in 1976. He testified that Mrs. Watson told him that she had attempted suicide four times and that she had been hospitalized for mental problems. He said that he referred to Mrs. Watson, at the time, as probably attempting to use a very real mental illness in a

manipulative manner. He reached this conclusion because he thought that given Mrs. Watson's four suicide attempts in relation to her marital problems, she was trying to make a statement by the suicide attempts. Dr. Corey testified that his examination of Mrs. Watson lasted about an hour and a half.

Stoney Jack Anderson testified about several instances of fraudulent conduct that Mrs. Watson committed while he was married to her from 1963 to 1970 and from 1971 to 1976. He stated that he returned home from overseas in 1975 to find that a window had been broken in a bedroom. He said that he asked Mrs. Watson what happened and that she told him that their home had been burglarized. He said that he eventually found the items that Mrs. Watson reported missing in his Winnebago. He said that Mrs. Watson had filed an insurance claim on the missing items for ten to eleven thousand dollars and that he called the police and insurance company and told them that nothing was missing.

Mr. Anderson testified that in 1972 or 1973, Mrs. Watson called him while he was working at a naval base and told him that she had received a call from a man threatening to kidnap and kill their daughter if they did not pay fifty thousand dollars. Mr. Anderson explained that he could have paid the fifty thousand dollars at the time because he had money from the settlement of an accident claim involving his daughter. Mr. Anderson said that he reported the threatening phone call to the base police, and the Federal Bureau of Investigation (F.B.I.) was called to investigate. Mr. Anderson said that he received another threatening call at work and that the caller demanded the money and said he was serious. The caller told Mr. Anderson that there would be three incidents that would demonstrate how serious he was.

Mr. Anderson testified that after he received the threatening call, he called his wife and told her to remain at the naval hospital until he could get there. He stated

13

that his wife called him back and told him that she could not go anywhere because her car would not start. Mr. Anderson said that he discovered that someone had pulled the wire harness out from under her car. He said that he could not find what was wrong with the car until his wife brought it to his attention. Mr. Anderson also said that Mrs. Watson sent him to the store one day and that when he returned he found that his utility building was on fire. The fire department helped him extinguish the fire.

Mr. Anderson testified that two F.B.I. Agents confronted him and his wife and accused Mrs. Watson of making the threatening phone calls. The F.B.I. Agents told them that they had conducted a voice analysis and that Mrs. Watson was the person making the threatening calls.

Mr. Anderson also testified that Mrs. Watson burned herself with cigarettes on two different occasions while they were married. Mr. Anderson said that the first time occurred in 1970 or 1971 after they had an argument. He said that Mrs. Watson left the house walking and that when she returned she was accompanied by the base police. The police ordered him to accompany them and accused him of beating his wife and burning her with cigarettes. Mr. Anderson said that he turned to his wife and told her to show her burns if she was burned. He said that Mrs. Watson raised her blouse and revealed four or five burns on her stomach. Mr. Anderson said that he was served his divorce papers the next day.

According to Mr. Anderson, Mrs. Watson burned herself with cigarettes again in 1976. He said that when he noticed the burns, he told her to "go ahead and get the divorce." He said that they got divorced in October 1976.

Mr. Anderson also testified that Mrs. Watson wrote several bad checks while they were married. He said that he eventually put all of his money in a checking

14

account that was solely in his name. According to Mr. Anderson, when he returned from a trip overseas, all of his money was gone, and he had two to three hundred dollars in overdraft charges on the account. Mr. Anderson stated that he saw copies of all of the checks that were written on his account and that Mrs. Watson had forged his name to the checks. He said that he never got the money back because he would not prosecute his wife.

The trial court ruled that Mrs. Watson could only be questioned concerning the checks she admitted to writing to K-Mart in 1992 and the surrounding circumstances. It ruled that she could not be asked any questions concerning the 1989 checks that were written to K-Mart or the checks written on her daughter's checking account. The court ruled that Mr. Anderson's testimony was not admissible because it was too remote, too speculative, too conclusive and an attempt to prove prior bad acts that do not amount to a conviction by extrinsic evidence in violation of Rule 608(b), Tenn. R. Evid. The court also excluded proof concerning Mrs. Watson's suicide attempts as being too remote. The defendant contends that evidence of the victim's prior bad acts are admissible under Rules 404(b) and 608, Tenn. R. Evid, and that their exclusion violated her due process rights.

## A. RULE 404(b)

The defendant contends that the proof she offered regarding prior bad acts of Mrs. Watson was admissible under Rule 404(b), Tenn. R. Evid. This rule prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair

15

prejudice.[1]  See Tenn. R. Evid. 404(b), Advisory Commission Comment; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987).  When, as in this case, a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion.  See Dubose, 953 S.W.2d at 652.

The defendant cites United States v. Cohen, 888 F.2d 770 (11th Cir. 1989), to argue that the victim's prior involvement in fraudulent schemes and burning herself with cigarette butts was admissible under Rule 404(b), Tenn. R. Evid., as being relevant to the issue of the defendant's guilt.  In Cohen, the Eleventh Circuit reversed the defendants' convictions for wire fraud, conspiracy, and tax evasion because the trial court prohibited the defendants from cross-examining a prosecution witness, who was also involved in the alleged crimes, about a similar fraudulent business transaction that the witness had conducted.  The court reasoned that the standard for admitting evidence under Rule 404(b), Fed. R. Evid., is relaxed when the evidence is offered by a criminal defendant.  Applying the relaxed standard, the court held that proof of the witness' prior bad acts was admissible to show his ability to plan and conduct a fraudulent scheme without help from the defendants.

Although the defendant combines all the instances of the victim's prior misconduct to contend that the pattern of fraudulent conduct is admissible under Rule 404(b) to show that the victim is capable of fabricating the alleged crimes, we do not view the various acts as being part of a common scheme and plan.  See State v. Hallock, 875 S.W.2d 285, 289-90 (Tenn. Crim. App. 1993).  Thus, we must examine

---

[1] We recognize that State v. Dubose, 953 S.W.2d 649, 653 (Tenn. 1997), may be read as indicating that Rule 404(b) does not apply to exclude acts committed by someone other than the criminally accused.  However, we do not believe that our supreme court meant to place such a limitation on the rule. The plain language of Rule 404(b) does not limit its application to the defendant's prior conduct.  Instead, the rule applies to any evidence "of other crimes, wrongs, or acts."  Tenn. R. Evid. 404(b).  The rule recognizes the risk of unfair prejudice that accompanies the introduction of prior bad act evidence and does not distinguish between bad act evidence that prejudices the defendant and that which prejudices the state.

each specific instance of conduct separately to determine its admissibility under Rule 404(b).  Also, insofar as the defendant is arguing that the proof of the prior acts is probative solely to impeach the victim's credibility, Rule 404(b) does not apply.  The admissibility of specific instances of conduct solely to impeach a witness' credibility is governed by Rule 608(b), Tenn. R. Evid., which excludes extrinsic evidence of the conduct.

In our view, Mrs. Watson's prior conduct in writing bad checks is only relevant with respect to her credibility.  The fact that Mrs. Watson wrote bad checks in the past is not relevant to show identity, intent, rebuttal of accident or mistake, or to any issue other than the victim's character for untruthfulness.  Thus, the trial court was correct in excluding extrinsic evidence of the conduct.  See Tenn. R. Evid. 608(b).

Likewise, the testimony concerning Mrs. Watson's prior suicide attempts was properly excluded under Rule 404(b).  Because this proof is solely relevant to Mrs. Watson's credibility, its admissibility is governed by Rule 608(b).

On the other hand, the testimony concerning the victim's fabrication of a burglary and of kidnapping threats for financial gain and her burning herself with cigarettes to blame her husband for the injuries presents a more complex issue.  These specific instances of conduct are not only relevant to impeach the victim's credibility but also tend to show that the victim has the ability to fabricate the crimes at issue.  See, e.g., State v. Gookins, 637 A.2d 1255, 1258 (N.J. 1994) (proof that officer falsified breathalyzer tests in other cases is relevant to show that officer had the opportunity to falsify test in present case); People v. Mascarenas, 98 Cal. Rptr. 728, 733-34 (Cal. Ct. App. 1971) (proof that prosecution witness had stolen and made false charges to build case against another person is relevant to show that he may have stolen and fabricated

17

charge in present case). Such proof is admissible under Rule 404(b), unless its probative value is outweighed by the danger of unfair prejudice.

The defendant in this case attempted to present Mr. Anderson's testimony concerning Mrs. Watson's prior false reports of burglary and abuse to show that Mrs. Watson had the ability to fabricate the alleged crimes. We agree with the defendant that Mr. Anderson's proffered testimony that Mrs. Watson falsely reported a burglary of her home to gain insurance proceeds, fabricated kidnapping threats to get money from him, and burned herself with cigarette butts on two different occasions is probative of her ability to fabricate the crimes for which the defendant was charged. However, we also recognize the factual differences between the prior incidents and the events in this case. Unlike this case, Mrs. Watson did not receive any injuries when she allegedly staged a burglary to collect insurance proceeds. Also, unlike the burns Mrs. Watson suffered in this case, the earlier burns Mrs. Watson inflicted upon herself were limited to her stomach area. Likewise, the probative value of the testimony is greatly diminished due to the fact that the prior conduct occurred more than seventeen years before the offenses in this case. Given these facts, we cannot say that the trial court abused its discretion by excluding the evidence.

The defendant contends that the trial court unfairly limited her defense and thus violated her due process rights when it excluded proof of Mrs. Watson's prior bad acts. We disagree. The proper exclusion of evidence based upon principles of relevance does not violate a defendant's due process rights.

**B. RULE 608(b)**

The defendant contends that she should have been allowed to question Mrs. Watson about her prior bad acts under Rule 608(b), Tenn. R. Evid. The state counters that the trial court properly applied Rule 608.

18

Under Rule 608(b), Tenn. R. Evid, a party can impeach a witness' credibility through cross-examination regarding specific instances of conduct under certain circumstances. The rule forbids the introduction of extrinsic proof solely for the purpose of impeaching a witness' credibility but states that a witness may be questioned regarding specific instances of conduct if the following conditions are satisfied:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;
>
> (2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect . . . .

Although Rule 608(b) requires that the trial court consider the probative value of the specific instance of conduct towards the witness' credibility, the rule does not specify the balancing of probative value versus risk of unfair prejudice that is required when the witness' misconduct occurred within ten years of the commencement of the case. See Herbert ex rel. Herbert v. Brazeale, 902 S.W.2d 933, 939 (Tenn. Ct. App. 1995).

By contrast, the rule does specify that the probative value of conduct that occurred more than ten years before the commencement of the prosecution must substantially outweigh its prejudicial effect. The rule also states that when the witness to be impeached is the criminally accused, the court must determine that the probative value of the conduct on the accused's credibility outweighs its unfair prejudicial effect on substantive issues. Tenn. R. Evid. 608(b)(2) and (3).

19

Under Rule 403, Tenn. R. Evid., relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice. One approach to dealing with the silence in Rule 608 with respect to the standard for balancing probative value versus risk of unfair prejudice with regard to recent misconduct that reflects upon the witness' credibility is to apply Rule 403 balancing. See, e.g., King v. Ahrens, 16 F.3d 265, 269 (8th Cir. 1994) (recognizing that Rule 403, Fed. R. Evid., balancing is an integral step toward a determination of admissibility under Rule 608(b), Fed. R. Evid.).

Another approach is to apply even balancing of probative value versus unfair prejudice. The application of this approach is supported by State v. Morgan, 541 S.W.2d 385 (Tenn. 1976), in which the Tennessee Supreme Court adopted Rule 608(b), Fed. R. Evid., and by the Advisory Commission Comments to the Rule 608, Tenn. R. Evid. Herbert, 902 S.W.2d at 939; N. Cohen et al., Tennessee Law of Evidence § 608.6, at 356 (3d ed. 1995). The Morgan court held that "where a witness is sought to be cross-examined as to specific instances of conduct as contemplated by Rule 608(b), the Court shall conduct a jury-out hearing for the purpose of determining that the probative value of such evidence outweighs its prejudicial effect." 541 S.W.2d at 390 (emphasis added). Likewise, the Advisory Commission Comment to Rule 608(b), Tenn. R. Evid., states:

> Part (b) reflects the Supreme Court's view of impeachment by prior bad acts. State v. Morgan, 541 S.W.2d 385 (Tenn. 1976), incorporated F.R.Evid. 608(b) into Tennessee case law. The proposed rule is even more specific than the federal version. It requires a jury-out hearing on probative value and basis for cross-examination, relatively recent misconduct, and notice plus analytical weighing of probative value versus unfair prejudice.

In Herbert, the court of appeals suggested that even balancing of probative value versus unfair prejudice is preferable "[b]ecause of the high possibility that the misconduct will be given too much weight by the jury and because of the

20

doubtful probative nature of such evidence." 902 S.W.2d at 939, (quoting N. Cohen. et al., Tennessee Law of Evidence § 608.6). We agree with this rationale. With these principles in mind, we must decide whether the trial court erred by preventing the defendant from cross-examining Mrs. Watson concerning prior bad acts.

### 1. Bad Check Allegations

The defendant contends that the trial court erred by not allowing her to question Mrs. Watson about the bad checks that were written out of Mrs. Watson's account in 1989 and the checks that were written on her daughter's account. Initially, we note that Mrs. Watson's involvement in passing bad checks would be probative of her credibility. Also, both sets of checks were written within ten years of the commencement of this case. Thus, the condition in Rule 608(b)(2), Tenn. R. Evid., has been satisfied, and the trial court should have permitted the defendant to cross-examine Mrs. Watson about the checks if it found a reasonable factual basis for the questioning and the probative value of the questioning was not outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 608(b).

Although the trial court held a hearing on the matter, it did not articulate its reason for forbidding the defendant from questioning Mrs. Watson about the checks she was indicted for writing in 1989. With respect to the 1989 checks, the defendant presented the testimony of Mr. McJunkin and Officer Matthews. Both testified that two out of three witnesses identified Mrs. Watson as the person who wrote bad checks to K-Mart for merchandise and then attempted to return the merchandise.[2] Although the state presented some proof to the contrary, we believe that based on the testimony of Mr. McJunkin and Officer Matthews, the defendant demonstrated that she had a reasonable basis for questioning Mrs. Watson about the 1989 checks.

---

[2]Although we recognize that this testimony is hearsay under Tenn. R. Evid. 801, a trial court is not bound by the rules of evidence when it considers a preliminary question of admissibility, except those with respect to privileges. Tenn. R. Evid. 104.

However, we also recognize that Mrs. Watson would have denied writing the 1989 checks and the checks out of her daughter's account if the defendant had cross-examined her about them. Mrs. Watson adamantly denied writing the 1989 checks when she was questioned about them during the pretrial hearings. Given Mrs. Watson's denial, we conclude that the trial court acted within its discretion in preventing the defendant from questioning Mrs. Watson about the checks. See United States v. Marvin, 720 F.2d 12, 14 (8th Cir. 1983) (upholding trial court's decision prohibiting cross-examination regarding insurance fraud after witness denied conduct in jury-out hearing).

With respect to the checks that were written on Ms. Anderson's account, the trial court stated:

> Now, as far as this young lady's testimony I don't know, but she didn't take out any charges, and Mrs. Watson has never been convicted of anything. She didn't see her mother write the checks. The checks have not been produced. Nobody has said that that's her signature. It's evidently not been paid. I mean for me to allow you to ask her even under, and of course I couldn't let her testify under 608 as to specific instances. I could if I felt the probative value outweighed the prejudicial allow you to ask Mrs. Watson about this, but on the basis of extrinsic evidence I don't find anything in her testimony other than her supposition that her mother wrote these checks to allow you to base that question on. I think that the way you are trying to connect is through the checks we have ruled on, that she has written bad checks in her life. There's no question about that.

We believe that the trial court acted within its discretion in preventing the defendant from questioning Mrs. Watson about the checks written out of her daughter's account.

Under Rule 608, Tenn. R. Evid, the defendant was not required to prove conclusively that Mrs. Watson wrote checks out of Ms. Anderson's account. As previously discussed, the rule only required the defendant to demonstrate a "reasonable factual basis" for questioning Mrs. Watson about the checks. In our view, the defendant met her burden by presenting the testimony of Ms. Anderson. Ms.

22

Anderson testified that she quit using her checking account and left around twenty dollars in it. Ms. Anderson saw one of her checkbooks in Mrs. Watson's pocketbook and later learned that several bad checks had been written on her account. Although Ms. Anderson's testimony is not overwhelming proof that Mrs. Watson wrote the checks, it does provide a reasonable factual basis for the defendant to question Mrs. Watson about the checks.

However, similar to questions concerning the 1989 checks, the undisputed testimony at the pretrial hearings reflects that had the defendant cross-examined her about the checks written on her daughter's account, Mrs. Watson would have adamantly denied writing them. Jackie Anderson testified that she had argued with Mrs. Watson and that Mrs. Watson denied writing the checks. Given this testimony, we cannot say that the trial court abused its discretion when it concluded that the probative value of the questioning did not outweigh the danger of unfair prejudice.

## 2. Prior Suicide Attempts

The defendant sought to introduce proof that Mrs. Watson was using a mental illness in a manipulative manner when she tried to commit suicide before her admission to a hospital in 1976. The trial court excluded any proof of Mrs. Watson's prior suicide attempts as being too remote. It is unclear from the record whether the defendant sought to question Mrs. Watson regarding the prior suicide attempts or whether the defendant just wanted to present the testimony of Dr. Corey.

In any event, the defendant was not entitled, under Rule 608, to cross-examine Mrs. Watson about the prior suicide attempts. The prior suicide attempts occurred more than seventeen years before the prosecution in this case. Thus, the trial court acted within its discretion in preventing cross-examination on the subject because

the probative value of the evidence did not substantially outweigh its prejudicial effect. See Tenn. R. Evid. 608(b)(2).

### 3. Fraudulent Conduct During Prior Marriage

The trial court was also justified in preventing the defendant from questioning Mrs. Watson about her alleged conduct during her marriage to Stoney Jack Anderson. The alleged conduct occurred more than seventeen years before the offenses in this case. Given the remoteness of the conduct, the trial court was justified in preventing the defendant from questioning Mrs. Watson about it unless its probative value substantially outweighed its prejudicial effect. See Tenn. R. Evid. 608(b). On the record before us, we cannot say that the trial court abused its discretion when it determined that the probative value did not substantially outweigh the prejudicial effect.

## II. VICTIM'S IDENTIFICATION OF DEFENDANT

Next, the defendant contends that the trial court erred by refusing to exclude Mrs. Watson's in-court identification of the defendant. The state counters that the trial court was correct in concluding that the pretrial identification procedures were not unduly suggestive and that Mrs. Watson's in-court identification of the defendant was therefore proper.

The defendant made a pretrial motion to suppress Mrs. Watson's identification of her. During a hearing on the motion, Officer Anthony Benefield testified that Officer Hyden went to the hospital and took a statement from Mrs. Watson at 12:15 p.m. on the day of the offenses. Officer Benefield said that at that time Mrs. Watson described the defendant as being a sixteen or seventeen-year-old white female that was five feet and six or seven inches tall and weighed around one hundred pounds. Officer Benefield said that officers were also looking for someone who could have been with Shannon Blaylock.

24

Officer Benefield explained that officers picked up the defendant in Rhea County. He said that he met up with the defendant at the Rhea County Sheriff's Department about 5:00 p.m. on October 31. Officer Benefield said that the defendant agreed to go to Bradley County. He said that he gave instructions for the defendant to be photographed while she was in Rhea County but that her picture may have been taken in Bradley County. In any event, Officer Benefield testified that the defendant was at the Bradley County Sheriff's Department at around 9:00 p.m when officers took photograph arrays to Mrs. Watson's house and Mrs. Watson picked out the defendant's photograph.

Officer Benefield identified two photograph arrays that were shown to Mrs. Watson. Each array contains six pictures of white females. Officer Benefield admitted that he did not tell the defendant that her picture was going to be used in the array. He said that he also did not tell the defendant that she needed an attorney. He said that he did not have the defendant sign any waiver of her rights before her picture was taken because she was not in custody at the time.

Officer Benefield said that he talked to Mrs. Watson on November 1 and that she told him that the defendant was ugly and had a possible cleft palate. He said that Mrs. Watson picked the defendant out of a live lineup at the jail on November 2.

At the conclusion of proof on the matter, the trial court ruled:

I am going to provisionally overrule the motion to suppress both the line-up, photo and the live line-up. And let me say for the record I have looked at all the photo line-ups, . . . but I can't imagine how you could get a fairer group of white females in a local jail facility than they were able to compile for purposes of this line-up. Also I may commend them on the video taping of the line-up. It left no question in the court's mind about the identification and the proper process being used to establish the identification of Samuel Scott Minton and Angela Manning in the eyes of the victim as the perpetrators or part of the perpetrators of the crime for which they are charged.

25

At trial, Mrs. Watson identified the defendant, and the jury viewed the photograph arrays and the videotaped lineup.

Although the defendant argues that the trial court should not have allowed Mrs. Watson to identify the defendant at trial, she has failed to articulate why she believes that the pretrial identification procedures were unduly suggestive. Instead, she argues that Mrs. Watson's identification of her is not credible under a totality of the circumstances because Mrs. Watson described the defendant in more detail after she picked the defendant out of a lineup.

Police first interviewed Mrs. Watson at the hospital at 12:15 p.m., within two hours of the offenses. We cannot say that the fact that Mrs. Watson only described the defendant in general terms at that time rendered her later identification of the defendant unreliable. We have reviewed the photograph array and the lineup and conclude that they were not unduly suggestive. See, e.g., Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967 (1968). Thus, the trial court did not err by admitting Mrs. Watson's identifications of the defendant.

## III. ESPECIALLY AGGRAVATED BURGLARY CONVICTION

Although not raised by the parties, the defendant's conviction for especially aggravated burglary violates T.C.A. § 39-14-404(d). The statute "prohibits using the same act to prosecute an accused for both especially aggravated burglary and another offense." State v. Oller, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992). In this case, the defendant was convicted of especially aggravated robbery and especially aggravated kidnapping based, in part, on the serious bodily injury Mrs. Watson suffered. Under these circumstances, T.C.A. § 39-14-404(d) prohibits a conviction for especially aggravated burglary. We recognize this as plain error, see

26

Tenn. R. Crim. P. 52(b), and reduce the defendant's conviction for especially aggravated burglary to aggravated burglary.

Also, we need not remand this case for the imposition of a sentence for the aggravated burglary conviction because the record before us is sufficient for us to impose an appropriate sentence. When imposing a sentence, we must consider (1) the evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236-38 (Tenn. 1986).

The only enhancement factor the trial court found relative to the burglary conviction was T.C.A. § 40-35-114(6), involving particularly great injury to a victim or particularly great amount of property taken from a victim. The trial court applied factor (6) because it concluded that the amount of property taken from Henry Farr was particularly great as it represented his life savings that he had planned to use to pay for his and his wife's burial expenses. This factor also applies to enhance the defendant's conviction for aggravated burglary based on the injuries Mrs. Watson suffered. The trial court found no applicable mitigating factors. The record supports the trial court's findings and we rely upon them in our consideration of an appropriate sentence for the defendant as a Range I, standard offender.

Beginning with the presumptive minimum sentence of three years, see T.C.A. § 40-35-112(b)(3), -210(c), and applying the applicable enhancement factor, we conclude that the record supports a four-year sentence for the aggravated burglary

27

conviction, to be served concurrently with the remaining sentences in this case. Also, a fine of ten thousand dollars is imposed.

In consideration of the foregoing, the defendant's conviction for especially aggravated burglary is modified to aggravated burglary and a four-year sentence and ten-thousand-dollar fine are imposed. The judgments of conviction for especially aggravated kidnapping, especially aggravated robbery, five counts of aggravated rape, conspiracy to commit aggravated burglary, and theft of property valued over one thousand dollars are affirmed.

_____Joseph M. Tipton, Judge

CONCUR:


_____
Gary R. Wade, Judge


_____
Joe D. Duncan, Special Judge